## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **STEVEN NOVIA,** individually and on behalf of all others similarly situated, | Case No.<br> 1:25-cv-11036-AK |
| *Plaintiff,* | **CLASS ACTION** |
| *v.* | **JURY TRIAL DEMANDED** |
| **MOBIZ INC.**<br>**AND**<br>**HARRIS BROTHERS**<br>**OF MICHIGAN, INC.** | |
| *Defendants.* | |

### Plaintiff's Response in Opposition to Defendant's Motion to Dismiss

## I.    INTRODUCTION

The Defendant's motion to dismiss the Plaintiff's claims for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA")'s ignores the straightforward imposition of liability against senders of illegal communications, like Defendant Mobiz, as well as the TCPA's plain and easily-complied with Caller ID requirements. In support of their motion, Defendant advances arguments that run contrary to the statutory text, Congressional intent, and TCPA-specific case law. As a result, Defendant's motion to dismiss should be rejected, as the growing body of law on such claim supports.

## II.    LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "When considering a motion to dismiss under subsection 12(b)(1) of the Federal Rules of Civil Procedure, the Court should apply a standard of review 'similar to that accorded a dismissal for failure to state a claim' under subsection 12(b)(6)." *Rodriguez v. Mass. Parole Bd.,* No. 16-cv-11113, 2017 U.S. Dist. LEXIS 24705, 2017 WL 706597, at *2 (D. Mass. Feb. 22, 2017). A motion to dismiss under Rule 12(b)(1) "is appropriate only when the facts adumbrated in the plaintiff's complaint, taken at face value, fail to bring the case within the court's subject-matter jurisdiction." *Gordo-González v. United States*, 873 F.3d 32, 35 (1st Cir. 2017).

### III.    ARGUMENT

A.    *The Complaint sufficiently alleges at the pleading stage that Mobiz is directly liable as the sender of the messages. No platform liability analysis is required.*

Mr. Novia's allegations are straightforward and plain, but they are not legal conclusions. He alleges the facts – that Mobiz itself *directly* sent the message because Harris Brothers "contracted with Mobiz to send text messages into this District" and that "Mobiz Inc. is a corporation that sends marketing text messages." *See* Complaint (Doc No. 1) at ¶ 5, 8. Moreover, the Plaintiff has alleged that this is the very reason that Mobiz exists and is *precisely* its business model, that of a "text message marketer" that sends "text messages *en masse*." *Id.* at ¶ 42. Mobiz's website confirms this fact, showing not only that Mobiz provides the service to send the messages, but also exercises substantial control over and provides substantial support for its customers' messaging campaigns, including by providing some of the content, including website sales pages, templates and automations, tools to verify consent, subscriber opt-in tools, and in some cases one on one support and personalized messaging. *See generally*, Mobiz | Platform Features, https://www.getmobiz.com/features [https://archive.md/N7KPh]; Mobiz | Pricing and plans, https://www.getmobiz.com/pricing [https://archive.md/SLnc8].

Simply put, Mobiz is a business that sends text messages for companies, like Defendant Harris Brothers, that lack the necessary technical resources to send the messages themselves. In other words, that makes Defendant Mobiz, not Defendant Harris Brothers, the *actual* sender of the text messages at issue and, as such, is *directly* liable for the calling conduct at issue as the *actual sender of the messages*. Upon information and belief, discovery in the possession of Onvoy, and any other phone companies, will reveal that the account used to send the messages was Mobiz's. As such, the Plaintiff has plainly alleged a theory of *direct* liability against Mobiz. Contrary to Defendant's assertions, the Plaintiff plainly alleges that Defendant Mobiz *directly*

*sent the text messages at issue* because the *messages were sent from Mobiz's telephone number.*

The scope of direct liability is determined by the statutory text, not FCC regulations, as the Defendant insinuates. *See New Prime Inc. v. Oliveira*, 586 U.S. 105, 119 (2019). Defendant's argument is at odds with the mountain of case law holding otherwise. As with any question of statutory interpretation, the court's inquiry "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). The relevant regulation here, 47 C.F.R. § 64.1200(c)(2), prohibits "initiat[ing]" a text message to any number on the National Do Not Call Registry. And anyone who "initiates" a call under the TCPA is subject to *direct* TCPA liability without further analysis. *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 960 (8th Cir. 2019) ("Thus, to be held directly liable, the defendant must be the one who "initiates" the call."). As the 2013 FCC order cited by the Defendant merely clarifies, "a person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a telephone call." 2013 FCC Order, *In re DISH Network, LLC*, 28 FCC Rcd. 6583 (2013). As such, all a Plaintiff needs to plead at the pleadings stage is that Mobiz took the steps necessary to physically place the call. Indeed, a seller, like Harris Brothers, "generally does not 'initiate' calls placed by third-part[ies]," like Mobiz. *Id.* at 6593. That's the end of the analysis, full stop. *Golan*, 930 F.3d at 960. Because the Plaintiff has alleged that the telephone number and the account from which the messages were sent was *Mobiz's* telephone number, and that Mobiz sent the messages, *precisely because that is Mobiz's business model*, it follows that Mobiz is *directly liable* for the text messages it initiated. Mobiz, not Harris Brothers, physically placed the unlawful messages at issue because they were sent from Mobiz's telephone account and because, at the end of the day, Mobiz was the sender of the messages. Mobiz is therefore the entity directly liable for the TCPA-violative conduct.

Far from being a "bystander," Br. at p. 6 (Doc No. 19), Mobiz was the triggerman

because it was the entity who sent the messages at issue because it physically initiated them. The Plaintiff has plausibly alleged, and this Court must accept as true for motion to dismiss purposes, the very same: that Mobiz, not Harris Brothers, directly sent the messages and physically initiated them, including because that is Mobiz's very business model. Sure, a telephone company may be considered a "bystander" in that it merely passes along a subscriber's communications, but that isn't what the Plaintiff has alleged, nor is it what the evidence shows, including Mobiz's own admissions on its website. Rather, the Plaintiff has alleged the actual phone company involved, Onvoy, and further alleged that Mobiz is the actual subscriber of the number that sent the messages at issue. Thus, on the facts as alleged in the Complaint, Harris Brothers is the *capo* ordering the hit, Mobiz is the hitman, and Onvoy is the bystander.

Defendant's motion incorrectly conflates direct liability with platform liability. The Court need not even consider the totality of facts and circumstances surrounding the placement of the call *at all* in this particular instance on a theory of platform liability, a fact-intensive analysis that courts have realized is reserved for summary judgment, *Nunes v. Twitter, Inc.*, 194 F. Supp. 3d 959, 964 (N.D. Cal. 2016), because the Plaintiff has plausibly alleged that Mobiz *directly* sent the messages at issue. To be clear, the Plaintiff alleges direct liability, not platform liability. There are two ways of proving TCPA liability, either by "taking the steps necessary to physically place a telephone call," (i.e. direct liability, alleged here) or by "being so involved in the placing of a specific telephone call as to be deemed to have initiated it." (i.e. platform liability). *Cunningham v. Montes*, 378 F. Supp. 3d 741, 747 (W.D. Wis. 2019) (quoting 2013 FCC Order, 28 FCC Rcd. at 6583). In *Cunningham*, relying on the FCC's order, the court outlined several factors at summary judgment that would be indicative of a platform liability theory. The Court need not consider *Cunningham*'s factors on a platform theory here because they are not relevant.

But it also remains clear that the Plaintiff can also proceed on a platform liability theory. Although only relevant to a platform liability analysis, Mobiz provides far more support and control than any mere telephone service provider, providing a turnkey solution for customers looking to send marketing text messages, including by proving one-on-one support, compliance support, including "subscriber opt-in tools," as well as "templates" and "sales pages," and even tells auction houses how to conduct text message marketing best suited for their business. *Text Message Marketing for Auctions*, MOBIZ (Sept. 16, 2024), https://www.getmobiz.com/blog/text-message-marketing-for-auctions [https://archive.md/5VWSv]. Those were nearly the same factors the Court considered in *Cunningham*, where it was demonstrated that the platform assisted customers in account setup, provided technical assistance and training manuals, that customers would not otherwise have sent the messages without the platform, and that the platform would sometimes start the process of sending. 378 F. Supp. 3d at 748. And here, unlike in *Cunningham*, Mobiz also suggests message content by providing templates, websites, and strategy. *Id.* ("Montes did not usually control the messages his customers conveyed.").

At bottom, Plaintiff has alleged that Mobiz physically sent the messages at issue. So much is evident by the fact that it is alleged that telephone number is *Mobiz's* number, not Harris Brothers', and that *Mobiz* sent the messages itself, albeit with Harris Brothers' content it suggested. The key question, thus, is whether the Plaintiff has plausibly alleged that Mobiz "initiated" the text messages at issue. Plaintiff respectfully submits that he has under the plain language meaning of "initiate," which the statutory text does not define. This Court "can decide what [the TCPA] means under ordinary principles of statutory interpretation, affording appropriate respect to the FCC's interpretation." *McLaughlin Chiropractic Associates, Inc. v. McKesson Corp.*, 145 S. Ct. 2006, 2019 (2025). By definition, to "initiate" is to "cause *or*

*facilitate* the beginning of: set going" as in "initiate a program of reform." Webster's Ninth New Collegiate Dictionary (1990) (cleaned up) (emphasis added). Thus, by both "causing" and "facilitating" the sending of the messages, Mobiz is liable under the statute's text.

The context of the FCC's 2015 order matters, as well. There, YouMail was not an "initiator" of a messages because it was simply a service that allowed an "app user," the recipient of a phone call, "to send an automatic text in response to a voicemail left by someone who called the YouMail app user." *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961 (2015). In other words, unlike the system here, which is undisputedly *active* in nature, sending texts to Mr. Novia and other class members without their involvement, the YouMail system was "reactive" in nature because, "in response to a call made to the app user, YouMail simply sends a text message to that caller, and only to that caller." *Id.* The FCC expressly went on to distinguish the YouMail system from the exact same non-consensual campaign alleged here, "This kind of service differs from the non-consensual calling campaigns over which the TCPA was designed to give consumers some degree of control." *Id.*

This case is not like the cases cited by the Defendants, either. In *Adzhikosyan v. Callfire, Inc.*, the court dismissed the case without prejudice, because, unlike here, the "complaint does not allege enough facts to show that Defendant initiated the text messages" and "does not explain how he knows that Defendant, rather than the parties that identified themselves in the messages, CR England and Kold Trans, sent the texts." No. CV 19-246 PSG (GJSX), 2019 WL 7856759, at *3 (C.D. Cal. Nov. 20, 2019). But here, the Plaintiff alleges Mobiz's involvement in the Complaint because Harris Brothers *told Mr. Novia* that it used Mobiz to send the text messages at issue and relied on its expertise and technical ability to do so, as well as the substantial resources it provided. The court held failure to plead facts proving initiation, unlike here,

warranted dismissal, but it did not analyze whether any facts of initiation were sufficient because none were pled as an initial matter. So too in *Frank v. Cannabis & Glass, LLC*, where the Complaint did not "provide any allegations that Defendant Springbig took steps physically necessary to place the call or that it was so involved in the placing of the call as to be deemed to have initiated it." No. 2:19-CV-00250-SAB, 2019 WL 4855378, at *2 (E.D. Wash. Oct. 1, 2019).

*Sheski v. Shopify (USA) Inc.* provides no solace to the Defendant, either. There, there were no allegations that Shopify "sent or was directly involved in sending the text messages" at all, when the only allegations were that Shopify's platform allowed online retailers to provide a check box and list functionality permitting retailers to collect telephone numbers for inclusion on a marketing list. No. 19-CV-06858-HSG, 2020 WL 2474421, at *2 (N.D. Cal. May 13, 2020). And *Meeks v. Buffalo Wild Wings, Inc.*, No. 17-CV-07129-YGR, 2018 WL 1524067, at *4 (N.D. Cal. Mar. 28, 2018), the Court dismissed claims against another company, Yelp, when the Plaintiff's allegations indicated that "Buffalo Wild Wings restaurants, initiated the text messages" to encourage the Plaintiff to download the Yelp app so that he could "[c]heck [his] place in line," but allowed the Plaintiff's claims against the initiator restaurant to proceed. *Id.*

Tellingly, the Defendant doesn't cite to a single case supporting dismissal at the pleadings stage on a theory of either direct or ill-pled platform liability, particularly not under the robust facts pled here, when the Plaintiff isn't even proceeding primarily on a theory of platform liability but rather direct liability. To the contrary, in *Perrong v. Chase Data Corp.*, another platform case decided at the motion to dismiss stage, the Court credited similar allegations as to initiation as those here, including the allegation that "Chase Data owned and operated the accounts used to contact [Plaintiff's] phone," in holding that the Plaintiff plausibly pled "that Chase Data was directly involved in the alleged TCPA violations." No. CV 22-2628, 2024 WL

329933, at *2 (E.D. Pa. Jan. 26, 2024). So too in *Nunes*, where it was alleged that *Twitter* sent the text messages containing its users' tweets and message content, rendering it the maker of the call. 194 F. Supp. 3d at 962, 966. And that's exactly what the Plaintiff alleges in his Complaint, that Defendant Mobiz physically initiated the text messages at issue, including because it owned the number and that is its very business model. The Complaint contains facts of initiation, unlike the systems in *CallFire* and *Frank*, and further demonstrates that the Defendant's very business model is the *sending* of text messages, not the mere collection of phone numbers for retailers to contact, on their own and in the future (potentially using a service like Mobiz's), as in *Shopify*.

As the *Twitter* and *Cunningham* courts observed, the analysis involves evaluating the "totality of the circumstances" and "will not provide easy answers in close cases." That necessarily counsels against dismissing well-pled allegations of platform liability, let alone direct liability, at the pleadings stage. Further analysis will be fact and circumstance specific, further developed in discovery, and best suited for jury trial, as in *Cunningham*. 378 F. Supp. 3d at 748. The Defendant's motion on this basis should be denied, or at the very least permitted to replead to cure any deficiencies with respect to the specificity of the direct liability and platform liability allegations, if any exist. At bottom, the Plaintiff has alleged that Mobiz directly initiated the messages at issue. Plaintiff's allegations are sufficient at the pleadings stage.

B.    *Section 227(c) of the TCPA provides a private right of action for violations of 47 C.F.R. § 64.1601(e), which was promulgated under 227(c), which has a private right of action.*

Defendant contends that the FCC issued section 64.1601(e) under 47 USC § 227(d)'s provision for "[t]echnical and procedural standards" which does not contain a private right of action. That's simply impossible. Contrary to the Defendant's representations, case law and legislative history confirm that the instant regulation at issue here, 47 C.F.R. § 64.1601(e), was promulgated under Section 227(c) of the TCPA, which contains a private right of action, and *not*

Section 227(d) as Defendant claims, which addresses not "procedural standards" generally, as claimed, but rather *specific procedural standards* with specific respect to *robocalls* and *fax machines*, not telemarketing calls. Indeed, to this end, the Defendant speaks out both sides of its mouth, dismissing Section 227(b) as a possible candidate because it "relates to robocalls," Br. at p. 14, but fails to exclude Section 227(d), which relates to the exact same thing. Indeed, just yesterday, another federal court issued a ruling, attached herein as Exhibit 2, upholding the propriety of the very claims Plaintiff asserts here, conducing a thoughtful analysis and citing to *Dobronski*, *infra. Newell v. JR Capital, LLC*, No. 2:25-cv-01419-GAM (E.D. Pa. July 16, 2025).

Defendant's argument is at odds with case law otherwise and the very statutory authority advanced by Congress. As with any question of statutory interpretation, the court's inquiry "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). The relevant regulation here, 47 C.F.R. § 64.1601(e), provides that "any person or entity that engages in telemarketing, as defined in section 64.1200(f)([13, formerly 10]), must transmit caller identification information." As a codified federal regulation dealing with "telemarketing," and with explicit references to the definitions promulgated under the TCPA in 1991 in 47 C.F.R. § 64.1200(f)(13), this particular regulation must have been promulgated under *some* part of the TCPA. "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). In this regard, only a handful of subsections of the TCPA allow for the promulgation of regulations:

    • § 227(b)(2) authorizes the FCC to implement requirements that relate to the use of prerecorded voices and automatic telephone dialing systems;
    • § 227(c) authorizes the FCC to promulgate rules relating to the "need to protect residential telephone subscribers' privacy rights";
    • § 227(d)(1)–(3) allow regulations relating to technical and procedural standards related to fax machines, automatic telephone dialing systems, and "systems that are used to transmit any artificial or prerecorded voice message";
    • § 227(e)(3) provides for regulations relating to misleading or inaccurate caller ID; and

• § 227(i) allows for the FCC to promulgate regulations to streamline information sharing with the FCC related to violations

*Dobronski v. Selectquote Ins. Servs.*, -- F. Supp.3d --, 2025 WL 900439, at *2 (E.D. Mich. Mar. 25, 2025). As the Court observed in *Dobronski*, all but § 227(c) are quickly eliminated as not even remotely applicable to the statutory provision here. The statutory provision at issue here could not have been promulgated pursuant to Section 227(d)(1), as Defendant here claims, as did the defendant in *Dobronski*, because that Section relates only to fax machines and automatic telephone dialing systems, not to telemarketing calls in general, just as Section 227(b), which Defendant concedes is inapplicable. It would be downright peculiar for the FCC to promulgate regulations "applying to all calls, including those that do not relate to automatic dialing, fax machines, or artificial or prerecorded messages" under Section 227(d)(1). *Id.* Defendant's reading would result in the FCC promulgating rulemaking in excess of its Congressionally granted authority. Given that Section 227(d) addresses procedural standards relating to the matters of Section 227(b), it cannot be the source of the subject provision, which itself plainly applies to and references 227(c), which deals with privacy.

A review of the appropriate legislative history confirms that the instant regulation here was promulgated in 2003 under rulemaking Congress explicitly authorized when it passed the Do Not Call Implementation Act of 2003, 15 U.S.C. § 6153 ("2003 Act"), which related to *consumer privacy*, the mainstay of Section 227(c). Pursuant to that mandate, the FCC began a rulemaking proceeding that expressly sought comment on whether "network technologies have been developed over the last decade," and which ultimately resulted in an order promulgating the implementation and incorporation of the instant caller ID legislative rule, as well as Do Not Call Registry rules. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 TCPA Order"), CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14118.

As the FCC explained in that 2003 TCPA Order rulemaking proceeding, "The new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibits them from blocking such information." *Id.* at 14017.

"[T]he 2003 FCC [TCPA O]rder applies to section 227(c). . . .Therefore, Radvansky may bring a case." *Radvansky v. Kendo Holdings, Inc.*, 744 F. Supp. 3d 1314, 1321, 1321 n.3, n.4 (N.D. Ga. 2024). The 2003 TCPA Order references Section 227(c) no fewer than 54 times and Section 227(d) only *once*, in the context of a 1997 regulation requiring fax broadcasters to print their information on fax messages. *Id.* at 14134. It references no other section of the TCPA as authority for the regulations it promulgated. Indeed, the FCC *explicitly tied* the Caller ID requirements at issue here to the TCPA's private right of action in Section 227(c), reasoning that "Caller ID requirements will improve the ability of consumers *to identify and enforce* do-not-call rights against telemarketers. . . . Consumers are frustrated by the failure of many telemarketers to transmit caller ID information, which, under certain circumstances, *makes it difficult for consumers to enforce* the TCPA." *Id.* at 14068, 14118 (emphasis added). It concluded that, pursuant to its authority *under Section 227(c) of the TCPA*, "the caller ID requirements at 47 C.F.R. § 64.1601(e) will go into effect on January 29, 2004." *Id.* at 14143. There can be no question, therefore, that the FCC promulgated the instant regulation under its authority under Section 227(c) of the TCPA, which required the FCC to promulgate privacy regulations.

As the *Dobronski* Court observed in commenting on the history of the TCPA:

[T]he regulatory history further buttresses its view. In an early rulemaking proceeding under the TCPA, the FCC noted that the TCPA directed it to consider a "number of alternatives for residential telephone subscribers to avoid receiving unwanted telephone solicitations ... includ[ing] a national database, network technologies, special directory markings, time of day restrictions, and industry-based or company-specific do-not-call lists." *In the Matter of Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8758 (1992). There can be little doubt that that direction came from § 227(c). *See* 47 U.S.C. § 227(c)(1)(A) (directing the FCC to "compare and evaluate alternative methods and

procedures [including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific "do not call" systems, and any other alternative]"). Then, in evaluating those alternatives, the FCC identified the lack of widespread caller ID as a barrier to cost-effective network technology implementation. *In the Matter of Rules*, 7 F.C.C. Rcd. at 8761.

In 2003, the FCC referred back to the discussion from above, and then it: expressly sought comment on whether "network technologies have been developed over the last decade," specifically asked "whether to require telemarketers to transmit the name and telephone number of the calling party," assessed caller ID's effectiveness and efficiency in supporting consumer privacy rights, and "determined to require all sellers and telemarketers to transmit caller ID information." *In re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14118–21 (2003). It elsewhere concluded that "Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers." *Id.* at 14068. The agency record thus suggests that caller ID requirements are a telephone network technology or other alternative that the FCC required in an attempt to help consumers enforce their privacy rights against telemarketers.

*Dobronski*, 2025 WL 900439, at *3.

The Defendant's argument must also fail because, in the 2003 Act, at 15 U.S.C. § 6153, Congress *explicitly* delegated authority to the FCC to promulgate regulations relating to the newly-created National Do Not Call Registry "under the [TCPA]," and the FCC did so by initiating a rulemaking proceeding under subsection (c), the only appropriate subsection dealing with "consumer privacy." *Dobronski*, 2025 WL 900439, at *3. The header of Section 1601 addresses "privacy restrictions." Critically, *the FCC also promulgated Section 1601 in the same Order as Section 64.1200(c)*, as outlined above. As *Dobronski* counsels, "That places § 64.1601(e) in the heartland of § 227(c), and thus supports the conclusion that the former was prescribed under the latter and benefits from § 227(c)(5)'s private right of action."

Given that the 2003 TCPA Order was the *very same Order* that established the National Do Not Call Registry in Section 64.1200(c), it would be incongruous to hold that it created a private right of action for the DNC requirements but at the same time failed to create them for the caller ID requirements in Section 64.1601(e). And under the 2003 Congressional mandate, the FCC promulgated the instant regulation, 47 C.F.R. § 64.1601(e), pursuant to its authority

*under* the TCPA, and pursuant to the *explicit authority* Congress in 2003 gave the FCC to conduct rulemaking *"under"* the TCPA, not just with respect to the Do Not Call Registry, as Defendant claims, but the other consumer privacy rulemaking Congress empowered the FCC to promulgate. 15 U.S.C. § 6153; s*ee also Siringi v. Parkway Fam. Mazda/Kia*, No. CV H-23-1499, 2023 WL 7130867, at \*2 (S.D. Tex. Oct. 30, 2023) ("The Federal Communications Commission promulgated 47 C.F.R. § 64.1200 under its authority to implement the Telephone Consumer Protection Act."). The plain text of the 2003 Act, as well as the FCC's resultant 2003 TCPA Order, *supra*, belies the Defendant's contention that those rules were not issued pursuant to authority from Subsection 227(c) the TCPA. Reading the 2003 Act as empowering regulations *under the TCPA's Section 227(c)* fits with how statutes, amendments, and administrative rulemaking works–the authorizing statute does not become the base statute or amendment, nor does the authorized rule. *See Alexander v. Sandoval*, 532 U.S. 275, 286, 291 (2001) (explaining genesis of a right of action). And it is the plain meaning evident from the text.

As outlined above, only a handful of subsections of the TCPA allow for the promulgation of regulations, and § 227(c) is the only appropriate one applicable here. The establishment of regulations "under the TCPA" for the transmission of caller ID information has nothing to do with regulations concerning autodialers (§ 227(b)), fax machines and other systems used to transmit prerecorded messages (§ 227(d)), or information sharing with the FCC ((§ 227(i)). It also can have nothing to do with later 2009 regulations surrounding the transmission of misleading or inaccurate caller ID (§ 227(e)), brought about by the Truth in Caller ID Act of 2009. *Dobronski*, 2025 WL 900439, at \*2 ("The FCC could not have promulgated a regulation pursuant to authority that it did not yet have."). Those regulations called for under the 2003 Act, including the Caller ID requirement at issue here, fit nicely within § 227(c), and only that

subsection, which explicitly deals with the promulgation of regulations to "protect residential telephone subscribers' privacy rights." And, as explained above, Section 227(c), under which 47 C.F.R. § 64.1601(e) was unquestionably promulgated, contains a private right of action.

Nor is Section 227(c) of the TCPA limited only to regulations regarding the Do Not Call Registry, but also encompasses other regulations protecting consumer privacy, some of which date back to the TCPA's 1991 enactment, including calling hours restrictions and company-specific do-not-call rules. It is evident that, like those rules, the instant Caller ID regulations further the goals of protecting consumer privacy by, *inter alia*, empowering consumers to lodge do not call requests with specific, identifiable companies. A review of 47 U.S.C. § 227(c)(1)(D) confirms that Congress explicitly contemplated and authorized the FCC to "consider whether there is a need for *additional Commission authority* to further restrict telephone solicitations, including those calls exempted under subsection (a)(3) of this section, and, if such a finding is made and supported by the record, *propose specific restrictions to the Congress*." In other words, no part of 47 U.S.C. § 227(c) is limited to the Do Not Call Registry, as the Defendant claims.

The FCC acted pursuant to Congress' 1991 mandate and, in so doing, explicitly made clear to Congress that it presumed to leave the door open to future rulemaking. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("1992 TCPA Order"), CC Docket No. 92-90, Report and Order, 7 FCC Rcd. 8752. In considering whether it was feasible to implement some form of Caller ID regulations in 1991, the FCC concluded that such solutions were "not technologically feasible" and "too costly," including because of the development of SS7 technology, which was still in its infancy at the time. *Compare Id.* at 8752 ¶ 16 *with* 2003 TCPA Order, 18 F.C.C. Rcd. at 14121 (rejecting argument that Caller ID requirements remained technologically infeasible). For that matter, the FCC also declined to create a Do Not Call

Registry in 1992, concluding that, given the limitations of technology *at the time,* the database

would be "costly and difficult to establish and maintain in a reasonably accurate form," *Id.* at

8760. Instead, it adopted the calling hours restrictions, other formal identification requirements,

and internal do not call requirements, now contained in 47 C.F.R. § 64.1200(d). To this end, the

FCC explicitly stated that "If our current approach is not successful . . . it may be necessary to

initiate a rulemaking proceeding to establish more stringent restrictions, or even to recommend to

Congress that it increase penalties or make other statutory changes." *Id.* at 8781-82.

A statute is "alterable when the legislature shall please to alter it." *Marbury v. Madison*, 5

U.S. 137, 177 (1803). The Congress and the FCC did just that in 2003 when Congress authorized

the FCC to promulgate, and the FCC promulgated, the instant regulation under Section 227(c).

Nor does the case law hold otherwise. Several of the cases cited by Defendant are other

Michigan district court cases that were subsequently reversed in *Dobronski*. And neither *Travel

Options* nor *Griffin* reached the conclusion that there was no right of action independently;

rather, these cases relied on faulty and underdeveloped reasoning in other cases, which

themselves did not engage in extensive analysis. And in *Meyer*, the plaintiffs wrongly conceded

that there was no right of action, and the Court there was persuaded by the reasoning in *Travel

Options*. No other case addresses Section 64.1601(e). As the *Dobronski* Court explained:

> In *Travel Options*, the court determined that § 64.1601(e) was promulgated to enforce §
> 227(d), which lacks a private right of action, because § 64.1601(e)'s caller ID requirement
> resembles "technical and procedural standards." In doing so, the court noted that the
> outcome was "not clear." To be sure, § 227(d) is titled "Technical and Procedural
> Standards," and it is not unreasonable to think that caller ID is "technical" or "procedural."
> But slotting § 64.1601(e) into § 227(d) on that basis is a little odd, given that § 64.1601(e)
> focuses on caller ID requirements for all telemarketing calls, and § 227(d) by its own terms
> governs only fax machines, automatic telephone dialing systems, and artificial or
> prerecorded voice systems. . . . By contrast, § 227(c) focuses on privacy rights generally and
> also spoke in terms of "methods and procedures" as well as "telephone network
> technologies" as mechanisms to protect subscriber privacy rights. . . . But it does not follow
> that the FCC could not promulgate technology-focused rules (like a caller-ID requirement)

under § 227(c)'s "telephone network technologies" language merely because it could also protect subscriber privacy rights in other, non-technological ways. . . . And it is not intuitive why the fact that a rule directly supports § 227(c)'s goals by employing a network technology and "will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers" bolsters the notion that § 64.1601(e) was not promulgated under the statute's subsection focused on protecting privacy rights. The Court sees no textual basis to carve from regulations that "protect" privacy rights those that merely "support" consumers' ability to enforce their rights—i.e., privacy rights are protected in part because wrongdoers are prohibited from hiding behind anonymity. At bottom, subsection 227(c) lets the FCC make rules to protect privacy rights and lets consumers sue when telemarketers violate those rules; § 64.1601(e) is a rule that helps protect privacy rights. *Travel Options's* influential inference seems to run uphill. . . . The other cases add little because they largely rely on *Travel Options* or on each other. . . . Those cases provided little analysis beyond that performed in *Travel Options*.

*Dobronski*, 2025 WL 900439, at *4–*5.In any event, the fact remains that the FCC stated that it

promulgated the instant caller ID regulations at 47 C.F.R. § 64.1601(e) pursuant to authority

Congress gave it in 15 U.S.C. § 6153, which authorized the FCC to promulgate the instant

regulation "under" the TCPA at 227(c). *See Bowen*, 488 U.S. at 208. The *only* authority "under"

which the FCC could promulgate regulations "under the [TCPA]" that supports the

Congressional mandate is § 227(c), which provides for the instant private right of action to

"protect residential subscribers' privacy rights to avoid receiving telephone solicitations to which

they object." The FCC said so itself, confirming it was doing so pursuant to § 227(c). *See*

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019) (citing 47 C.F.R. §

64.1200(c)(2) and explaining that it was created pursuant to regulations promulgated by the FCC

under Section 227(c)). There is simply no other statutory subsection "under the TCPA" upon

which Congress could direct the FCC to promulgate the Caller ID regulations it ordered the FCC

implement (including to align with the FTC), the entire purpose of which is to permit consumers

to *lodge their objections against unsolicited telemarketing calls*. There exists a private right of

action for violations of 47 C.F.R. § 64.1601(e) (as with 64.1200(c) and (d)), as Congress

intended under 47 U.S.C. 227(c)(5).

16

C.    *Plaintiff has standing because the provision of inaccurate caller ID name information harms him.*

Defendant also argues that Plaintiff allegedly lacks standing because he lacks a concrete injury stemming from the Defendant's admitted failure to transmit accurate caller ID information. However, the failure to provide such information does in fact harm the Plaintiff, as the Plaintiff's declaration makes clear. In his declaration, Mr. Novia points out that:

o    The lack of accurate caller ID information transmitted along with text messages undermines trust in the source of the text messages I receive and my ability to identify those calling me illegally.

o    Accurate caller ID information would have allowed me to view the sender, including while my phone screen was locked, and ascertain that the message was not important and prioritize my daily tasks accordingly.

o    I would be forced to add the number to my contacts, which simply adds to clutter in my contacts book and is an additional step to take for messages I don't even want and want to ignore.

o    Because the caller ID information did not identify the caller by name, I had no way to know who was attempting to solicit me, whom to ask to stop, or whom to sue to protect my rights.

*See* Exhibit 1, Declaration of Steven Novia. And, apropos of the Defendant's attempts to toss the Do Not Call Registry claims addressed above, the provision of accurate caller ID name information would be yet another fact and feather in the Plaintiff's cap at the pleadings stage to show that the Defendant initiated the subject text messages. It is therefore plain, on the basis of the Plaintiff's own declaration and the harms the requirement seeks to remedy that the Plaintiff has suffered a cognizable injury in fact.

However, even putting that aside, the subject regulation protects consumer privacy, and the failure to abide by it results in concrete harms sufficient for Article III standing. Far from a bare procedural violation, the failure to transmit accurate caller ID information imposes real harms on consumers. As the FCC observed, "Caller ID allows consumers to screen out unwanted calls and to identify companies that they wish to ask not to call again. Knowing the identity of the caller is also helpful to consumers who feel frightened or threatened by hang-up and "dead air" calls. We disagree with those commenters who argue that caller ID information only benefits

those consumers who subscribe to caller ID services. . . . Caller ID also should increase

accountability and provide an important resource for the FCC and FTC in pursuing enforcement

actions against TCPA and TSR violators." 2003 TCPA Order, 18 F.C.C. Rcd. at 14121.

Nor is it any matter that the messages mentioned Harris Brothers. Just because Harris

Brothers (arguably) did not violate the TCPA's requirement that the caller identify themselves on

the call does not mean that Harris Brothers also did not violate the requirement that it transmit

caller ID information with its name. Anyone can say that they are anyone else in a text message

or phone call, but the provision of caller ID name information, which has to be verified by a

telephone company, provides an additional level of assurance to confirm the identity of the

caller. This further lends credence to the obvious fact that the Caller ID information requirements

here were created to buttress the TCPA's own caller-specific identification requirements found at

47 CFR § 64.1200(d)(4) for reasons exactly as this.

These harms are exactly in line with those that Congress and the FCC recognized when it

promulgated the instant rule. Congress explicitly passed the 2003 Act with the explicit statement

that the TCPA's then-current consumer privacy protections were inadequate. It is clear that, in

Congress' directive to align the FTC and FCC's procedures, Congress intended for any

subsequent rulemaking, including the FCC's 2003 TCPA Order, to remedy a concrete harm by

giving a right of action. Indeed, Congress explicitly stated that, "despite [internal do not call list

and other] restrictions, telemarketing complaints continue to rise and there is an increasing need

to provide consumers with the ability to opt-out of telemarketing calls." House Report 108–8,

108th Cong., 1st Sess. (2003) at 2-3. Accordingly, the Committee explicitly explained that:

> The FCC's do-not-call rules were created under the TCPA. That statute explicitly gives the
> FCC the authority to set up a national do-not-call database. In 1992, the FCC undertook a
> rulemaking, and after reviewing comments, determined that a national do-not-call list was
> too costly and burdensome at that time. The FCC instead opted to require telemarketers to

maintain company-specific do-not-call lists. On September 12, 2002, the FCC issued a notice of proposed rulemaking to *review and possibly revise* its do-not-call rules. The comment period closed on January 31, 2003, and the FCC's Chief of Consumer and Governmental Affairs Bureau announced that the FCC's goal is to avoid regulatory duplication by working closely with the FTC and fashioning rules that benefit consumers and the telemarketing industry. As the FCC undertakes the process of revising its do-not-call regulations, there is the potential for inconsistencies between the FTC and FCC do-not-call rules. To address this issue, H.R. 395 directs the *FCC to complete its rulemaking within* 180 days of enactment and further requires the FCC to consult and coordinate with the FTC to maximize consistency between the two regulations. However, because the *FCC is bound by the TCPA*, it is impossible for the FCC to adopt rules identical to the FTC's TSR. . . . In order to remedy these types of inconsistencies, either the FTC or FCC must address them administratively, or Congress must address them legislatively. We encourage the FTC and the FCC to take the necessary steps to make their rules as consistent and compatible as possible.

*Id.* at 4 (emphasis added). The 2003 TCPA Order took that congressional mandate to align the FTC and FCC's rules seriously, including with respect to the *very caller ID provision at issue*, by observing that the "FTC also adopted new rules on the use of predictive dialers and the transmission of caller ID information. . . . Telemarketers will also be required to transmit the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service." 2003 TCPA Order, 18 F.C.C. Rcd. at 14024. Consistent with the Committee's intent, Congress required the FCC to issue the 2003 TCPA Order, a "final rule pursuant to the rulemaking proceeding that it began on September 18, 2002, *under the Telephone Consumer Protection Act* (47 U.S.C. 227 et seq.)." 15 U.S.C. § 6153 (emphasis added). It further directed that, "In issuing such rule, the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission." *Id.* As explained above, the FCC explained that part of that alignment included adoption of caller ID rules similar to those promulgated by the FTC in the Telemarketing Sales Rule, which similarly deals with consumer privacy and is enforceable by the FTC. The instant regulation flows naturally from Congress' mandate to ensure consistency between FTC and FCC regulations.

19

As in other portions of the TCPA, the benefits that caller ID information provides to consumer privacy protections means that the failure to transmit accurate information prohibits consumers from *inter alia*, identifying callers at a glance, both in their daily lives, as well as for the purposes of holding them accountable under the TCPA. Those harms are typical of the other common law harms affecting consumer privacy interests that give rise to a cognizable Article III injury. *Dickson v. Direct Energy, LP*, 69 F.4th 338, 344 (6th Cir. 2023) (reasoning that TCPA claims in class actions is sufficient to establish Article III standing because the intrusion caused by unwanted communications bears a close relationship to the kinds of harms protected by the common law, including intrusion upon seclusion); *Drazen v. Pinto*, 74 F.4th 1336, 1342 (11th Cir. 2023) ("intangible harms can satisfy Article III's concreteness requirement"); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118 (9th Cir. 2022).

Given that the provision of caller ID name provides an increased accountability and resource, especially here, it is a separate requirement constituting a separate violation of the TCPA constituting a concrete harm, and for good reason. Caller ID provides a technologically expedient, separate, and arguably more reliable means, of connecting the caller to the text message than the content of the text message itself, which requires human reading and intervention. It facilitates consumer choice on what messages to read and blocking. It distinguishes spam from important business messages. The TCPA's Caller ID requirement thus counsels against dismissal on the specious basis that the failure to abide by it does not constitute a cognizable injury. For the foregoing reasons, the text message at issue did not comply with 47 C.F.R. § 64.1601(e)'s requirements, which is itself a harm that the statute remedies.

## IV.    CONCLUSION

This Court should deny Defendant's motion to dismiss in its entirety. Alternatively, it should permit the Plaintiff to amend to correct any deficiencies.

Dated: July 17, 2025

Plaintiff,
By Counsel,

By: */s/ Anthony I. Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(617) 485-0018
anthony@paronichlaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: July 17, 2025

*/s/ Anthony I. Paronich*
Anthony I. Paronich

21